IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

LARENDA HICKS,                    §
                                  §
      Plaintiff,                  §
                                  §
vs.                               §   Civil Action No. H-06-1711
                                  §
SUN LIFE ASSURANCE COMPANY OF     §
CANADA, PINNACLE INDUSTRIES,      §
LTD., LONG TERM DISABILITY PLAN   §
AND PINNACLE INDUSTRIES, LTD.,    §
                                  §
      Defendants.[1]              §

**MEMORANDUM AND RECOMMENDATION**

Presently pending before the court is Defendant Sun Life Assurance Company of Canada's Motion for Summary Judgment (Docket Entry No. 25), Plaintiff's Cross-Motion for Summary Judgment (Docket Entry No. 27) and the responses filed thereto.  For the reasons discussed below, it is **RECOMMENDED** that Defendant's motion for summary judgment be **GRANTED** and that Plaintiff's cross-motion for summary judgment be **DENIED**.

## I.  Case Background

Plaintiff Larenda Hicks ("Hicks" or "Plaintiff") was employed by Pinnacle Industries, Ltd., ("Pinnacle") as an operations manager since 1983.  This was a sedentary data entry position that was performed indoors.[2]  In 2004, Hicks experienced headaches and

---

[1]     Pinnacle Industries, Ltd. and Pinnacle Industries, Ltd., Long Term Disability Plan are no longer parties to this action.  See Order Granting Stipulation of Dismissal Without Prejudice, Docket Entry No. 11.

[2]     Defendant's Motion for Summary Judgment ("DMSJ"), Docket Entry No. 25, Ex. A-3, Claim File, pp. 112, 113.

fatigue that progressively worsened.  Hicks applied for long-term disability benefits in February 2005 under the group insurance policy issued to Pinnacle.  Defendant Sun Life Assurance Company of Canada ("Sun Life" or "Defendant") denied Plaintiff's claim for benefits, finding that she had failed to establish that she was totally disabled as defined by the Policy during the ninety-day elimination period that commenced on the first day of total disability.  This lawsuit followed.

**A.   The Policy**

Effective July 1, 2004, Pinnacle contracted with Sun Life for group insurance coverage.  Included in the policy was long-term disability insurance for Pinnacle employees, defined as "All Full-Time Employees scheduled to work at least 30 hours per week."[3]  The Summary Plan Description provided, in pertinent part:

> "Total Disability" or "Totally Disabled" means during the Elimination Period and the next 24 months, the employee, because of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation. After Total or Partial Disability benefits combined have been paid for 24 months, the Employee will continue to be Totally Disabled if he is unable to perform with reasonable continuity any Gainful Occupation for which he is or becomes reasonably qualified for by education, training, or experience.
>
> "Elimination period" means a period of continuous days of Partial or Total Disability for which no LTD benefit is payable.
>
> "Pre-existing condition" means during the 3 months prior to the [Employee's] Effective Date of Insurance, [the

---

[3]      DMSJ, Ex. A-1, The Policy, pp. 768, 802-11.

Employee] received medical treatment, consultation, care, or services, including diagnostic measures, or took prescribed drugs or medication for the disabling condition.[4]

A disabling condition would fall under the pre-existing condition exclusion if a claimant received medical treatment, consultation, medication, or care for that condition between April 1, 2004, and June 30, 2004.[5]

The Summary Plan Description also provided that the insurance terminated on the date that the employee ceased to be "Actively at Work."[6]  "Actively at Work" was defined by the Policy to mean "that an Employee performs all the regular duties of his job for a full work day scheduled by the Employer at the Employer's normal place of business...."[7]  In the present case, the last day Plaintiff was actively at work was November 8, 2004; her eligibility for long-term disability benefits ceased on November 9, 2004.

The Policy granted Defendant the discretionary authority to interpret the Policy and to pay long-term disability benefits:

> The Plan Administrator has delegated to Sun Life its entire discretionary authority to make all final determinations regarding claims for benefits under the benefit plan insured by this Policy.  This discretionary authority includes, but is not limited to, the determination of eligibility for benefits, based upon enrollment information provided by the Policyholder, and

---

[4]     DMSJ, Ex. A-2, Summary Plan Description, pp. 865, 877-78.

[5]     DMSJ, Ex. A-1, The Policy, pp. 785, 802.

[6]     DSMJ, Ex. A-2, Summary Plan Description, p. 840.

[7]     DMSJ, Ex. A-1, The Policy, p. 777.

3

the amount of any benefits due, and to construe the terms of the Policy.

Any decision made by Sun Life in the exercise of its authority, including review of denials of benefit, is conclusive and binding on all parties.  Any court reviewing Sun Life's determinations shall uphold such determination unless the claimant proves that Sun Life's determinations are arbitrary and capricious.[8]

Finally, the Policy required that the claimant submit a proof of claim that included a description of the disability, the date of the disability and the cause of the disability.[9]  The notice of claim for long-term disability was due no later than thirty days before the end of the Elimination Period and the proof of claim for long-term disability was due no later than ninety days after the end of the Elimination Period.[10]

**B.   Plaintiff's Medical History**

The court summarizes the medical records submitted in support of Plaintiff's claim for disability.[11]

**1.   Pre-Policy Period (Prior to July 1, 2004)**

On January 26, 2004, a blood test revealed that Plaintiff had slightly elevated Epstein Barr virus titers, elevated cholesterol and normal blood sugar, calcium, total protein, liver functions and

---

[8]    DMSJ, Ex. A-1, The Policy, p. 820.

[9]    Id.

[10]   Id. at 819.

[11]   The court has supplied definitions of some medical terms and medications to inform the reader; they are not determinative of the outcome of the case.

liver enzymes.[12]  On January 28, 2004, a Computed Tomography ("CT") scan of Plaintiff's brain showed no abnormalities.[13]

On February 5, 2004, Plaintiff saw G. Davita, M.D., ("Dr. Davita"), a psychiatrist, complaining of headaches and memory loss.[14]  Dr. Davita prescribed Lexapro, a medication that treats depression and anxiety disorders.[15]

On February 6, 2004, Plaintiff saw Greg McLauchlin, M.D., ("Dr. McLauchlin"), a neurologist, complaining of headaches and eye and ear pain.[16]  Plaintiff related that the headaches were constant and that she also suffered from poor sleep, diffuse burning pain in her limbs, a lack of energy, spasms in the chest, back, and head, and itching skin.[17]  In a report dated February 11, 2004, Dr. McLauchlin reported that Plaintiff had 5/5 strength in both deltoids, biceps, triceps, brachioradialis, wrist extensors, finger extensors, finger flexors, iliopsoas, knee extensors, knee flexors,

---

[12]    DMSJ, Ex. A-3, Claim File, p. 310.  Epstein-Barr virus, frequently referred to as EBV, is a member of the herpesvirus family and one of the most common human viruses. The virus occurs worldwide, and most people become infected with EBV sometime during their lives. In the United States, as many as 95% of adults between 35 and 40 years of age have been infected.  Nat'l Center for Infectious Diseases, "Epstein Barr Virus and Infectious Mononucleosis," available at http://www.cdc.gov/ncidod/diseases/evb.htm.

[13]    DMSJ, Ex. A-3, Claim File, p. 440.

[14]    DMSJ, Ex. A-3, Claim File, p. 449.

[15]    DMSJ, Ex. A-3, Claim File, pp. 452, 683.

[16]    DMSJ, Ex. A-3, Claim File, p. 284.

[17]    DMSJ, Ex. A-3, Claim File, p. 286.

plantar flexors, and 4/5 strength in left wrist extensors.[18] Reflexes were 3+ in both biceps, triceps, brachioradialis, and knees with crossed adductors, and 2+ in both ankles with down-going toes bilaterally.  Plaintiff had normal sensation to temperature, pinprick, vibration, proprioception and light touch throughout.[19] Her coordination and gait were found to be normal.  Dr. McLauchlin noted a stiffness in Plaintiff's neck and shoulder area, but Plaintiff denied tenderness on palpitation of the head and neck.

Dr. McLauchlin noted that Plaintiff was not currently taking medication for headaches.[20]  He concluded that Plaintiff suffered from chronic tension-type headaches and prescribed medication for pain relief.[21]

On March 10, 2004, a CT scan of Plaintiff's neck was ordered by Eric Powitzy, M.D., an ear, nose and throat ("ENT") doctor at the Center for ENT, after Plaintiff complained of a neck mass and swelling.[22]  The scan revealed no abnormalities.[23]  On March 17, 2004, a true vocal fold growth was removed from Plaintiff's vocal chord.  On April 27, 2004, Plaintiff returned to the Center for ENT

---

[18]    DMSJ, Ex. A-3, Claim File, p. 289.

[19]    Id.

[20]    DMSJ, Ex. A-3, Claim File, p. 288.

[21]    Id.

[22]    DMSJ, Ex. A-3, Claim File, p. 462.

[23]    Id.

complaining of nose and chest congestion.[24]  The surgical site was found to be well-healed.[25]  Plaintiff was diagnosed with acute bronchitis.[26]

**2.  Post-Policy/Pre-Onset of Alleged Disability (July 1, 2004, to November 8, 2004)**

On July 1, 2004, Plaintiff was seen by Norman Berkman, M.D., ("Dr. Berkman"), an internist, for what appeared to be a routine checkup.[27]  Plaintiff reported that she was doing well, had had pre-cancerous cells removed from her vocal chords and was under stress because she was going through a "court battle."[28]  She also related that she had resumed taking Paxil, an antidepressant.  On July 19, 2004, Dr. Berkman wrote prescriptions for Paxil, Zetia and Pravachol, the latter two being cholesterol-lowering medications.[29]

On November 2, 2004, Plaintiff was seen at the Center for ENT complaining of a lump in her throat and tightness in her throat when she swallowed.[30]

---

[24]    DMSJ, Ex. A-3, Claim File, p. 459.

[25]    Id.

[26]    Id.

[27]    DMSJ, Ex. A-3, Claim File, p. 354.

[28]    Id.

[29]    DMSJ, Ex. A-3, Claim File, p. 355.  See also http://www.drugs.com/pravachol.html.

[30]    DMSJ, Ex. A-3, Claim File, p. 460.

7

**3.   Elimination Period (November 9, 2004,[31] to February 7, 2005)**

On November 15, 2004, Plaintiff returned to the Center for ENT and complained of a growth on her left ear that had been there for six months, a sore throat, and vomiting.[32]  She reported that she was lethargic, had a tender neck and had had high Epstein Barr virus titers in the past.[33]   She also complained of migraine headaches and weakness.[34]  The physician noted "viral illnesses" on her chart.[35]

On November 17, 2004, Plaintiff returned to Dr. Berkman complaining of recurrent headaches and weakness.[36]  A blood test showed slightly elevated lymphs, cholesterol, triglycerides and HDL and slightly low glucose, but was within normal ranges on all other parameters.[37]  A lab test for Epstein Barr virus showed two slightly elevated factors.[38]  Dr. Berkman ordered a Magnetic Resonance Imaging ("MRI") of Plaintiff's brain and also suggested that

---

[31]    Plaintiff claimed that she became totally disabled as of November 9, 2004.

[32]    DMSJ, Ex. A-3, Claim File, p. 461.

[33]    Id.

[34]    Id.

[35]    Id. The medical record does not indicate if medications were prescribed.

[36]    DMSJ, Ex. A-3, Claim File, p. 356.

[37]    DMSJ, Ex. A-3, Claim File, p. 200.

[38]    DMSJ, Ex. A-3, Claim File, p. 202.

Plaintiff revisit her neurologist, Dr. McLauchlin, and see Patricia Salvato, M.D., ("Dr. Salvato"), a physician specializing in immune disorders.[39]

On November 22, 2004, an MRI of Plaintiff's brain showed multiple small abnormal bicerebral signal foci.  The radiologist stated, "These are unassociated with mass effect or edema and demonstrate no contrast enhancement.  In a patient of this age, they be [sic] related to white matter demyelination/degeneration or to changes of small vessel ischemic disease.  Please correlate this clinically."[40]  All other aspects of the MRI were considered normal.[41]

On December 8, 2004, Plaintiff saw Dr. Salvato and disclosed that she had been experiencing fatigue for over a year, twenty-four hours per day, seven days per week.[42]  Plaintiff complained of joint and muscle pain, memory loss, decreased concentration, frequent migraine headaches, depression, frequent sore throats, hypersensitive skin, bilateral ear pain, coughing, and sleep disturbances.  A physical exam noted a sore throat and tender neck glands.  Dr. Salvato reported that Plaintiff's motor strength was 5/5 up and down, bilaterally, and that she had a negative Romberg

---

[39]     DMSJ, Ex. A-3, Claim File, pp. 302, 356.

[40]     DMSJ, Ex. A-3, Claim File, p. 203.

[41]     DMSJ, Ex. A-3, Claim File, p. 297.

[42]     DMSJ, Ex. A-3, Claim File, p. 236.

test.[43]   Dr. Salvato noted that Plaintiff was taking Paxil and Pravachol.[44]

On December 16, 2004, Plaintiff returned to Dr. McLauchlin complaining of an increase in headaches since October 2004.  She also reported bone and joint pain, chest pain, swollen feet, blurred vision, a cough, dizziness, numbness, weakness, forgetfulness, nervousness, depression, anxiety and trouble sleeping.[45]   Dr. McLauchlin prescribed Topamax, a migraine prevention medication.[46]

On December 17, 2004, Plaintiff again saw Dr. Salvato, complaining of headaches, muscle weakness, coughing, fatigue, memory loss and dropping things.  Dr. Salvato assessed Plaintiff as having fatigue, arthralgias, chronic headaches and memory disturbances.[47]   Dr. Salvato prescribed a course of GLA/ATP injections.[48]

---

[43]     DMSJ, Ex. A-3, Claim File, p. 238.  The Romberg test is a neurological test to detect poor balance.  The University of Utah, "Neurologic Exam," available at http://library.med.utah.edu/neurologicexam/html/ sensory_normal.html.

[44]     DMSJ, Ex. A-3, Claim File, p. 293.  Plaintiff requested medication for her headaches and cough.  As portions of the medical records are indecipherable, it is unclear if any medications were prescribed at that time.

[45]     DMSJ, Ex. A-3, Claim File, p. 291.

[46]     See http://www.topamax.com.

[47]     DMSJ, Ex. A-3, Claim File, p. 234.

[48]     GLA, or Gamma-linolenic acid, is an essential fatty acid in the omega-6 family that is found in plant-based oils.  It is believed to reduce inflammation and may diminish joint pain associated with rheumatoid arthritis. Univ. of Maryland Med. Ctr., "Gamma-linolenic acid," available at

On January 10, 2005, Plaintiff returned to Dr. McLauchlin for headache pain and reported that the Topamax was not relieving the pain.  Dr. McLauchlin told Plaintiff to discontinue the Topamax and prescribed Depakote, another migraine medication.[49]

On January 21, 2005, Hicks returned to Dr. Salvato and reported continuing headaches, memory disturbances, as well as chest, arm, and leg pain.[50]  She was also concerned about a high blood pressure reading taken at home.[51]  Plaintiff saw Dr. Salvato again on February 3, 2005.  Hicks reported that her leg, arm and hand pain were worse and that she had developed flaky rashes.[52]  The chart notes, "Wants to do disability."[53]  Dr. Salvato also noted that Plaintiff was "positive" for depression.[54]  Dr. Salvato referred Plaintiff for a functional capacity examination, a neuropsychological examination, and an MRI.[55]  Dr. Salvato also signed an Attending Physician Statement in support of Plaintiff's

---

http://www.umm.edu/altmed/articles/gamma-linolenic-000305.htm. ATP, or Adenosine triphosphate is a multifunction nucleotide and the main energy source for most cell functions.  "Adenosine Triphosphate," MSN Encarta, available at http://encar,ta.msn.com/encyclopedia_761579045/Adenosine_ Triphosphate.html.

[49]     DMSJ, Ex. A-3, Claim File, p. 298.

[50]     DMSJ, Ex. A-3, Claim File, p. 228.

[51]     Id.  Again, because portions of the medical records are illegible, the court cannot determine if medications were prescribed at this visit.

[52]     DMSJ, Ex. A-3, Claim File, p. 227.

[53]     DMSJ, Ex. A-3, Claim File, p. 224.

[54]     Id.

[55]     DMSJ, Ex. A-3, Claim File, p. 226.

claim for long term disability benefits, checking the box on the form that indicated that Plaintiff was totally disabled as of February 3, 2005.

During the elimination period, Plaintiff filled prescriptions for Zetia,[56] Pravachol,[57] Paxil,[58] Diethylpropion,[59] Alprazolam,[60] Zyrtec,[61] Benzonatate,[62] Hydromet syrup,[63] Butalbital/APAP/caffeine,[64]

---

[56]   DMSJ, Ex. A-3, Claim File, p. 402.

[57]   Id.

[58]   DMSJ, Ex. A-3, Claim File, p. 403.

[59]   Id. Diethlypropion is a diet medication. See Ex. A-3, Claim File pp. 685-87.

[60]   DMSJ, Ex. A-3, Claim File, p. 404. Also known as Xanax, it is an anti-anxiety medication. See Ex. A-3, Claim File p. 695.

[61]   DMSJ, Ex. A-3, Claim File, pp. 405-6. Zyrtec is an antihistamine. See http://www.zyrtec.com.

[62]   DMSJ, Ex. A-3, Claim File, p. 406. Benzonatate is a cough medication. See http://www.info-pharm.com/benzonatate/index.html.

[63]   Id. Hydromet syrup is a cough medication. See http://www.drugs.com/cdi/hydromet-syrup.html.

[64]   Id. This combination of drugs is typically prescribed for tension headaches. See http://www.rxlist.com/cgi/generic/esgic_cp.htm.

Ketek,[65] Topamax,[66] Cheratussin syrup,[67] D-amphetamine,[68] Depakote,[69] Adderall,[70] and Diovan.[71]

### 4.   Post-Elimination Period

On February 9, 2005, an MRI of Plaintiff's brain showed "multiple foci of subcortical periventricular white matter hyperintensity with a more intense focus in the right anterior putamen."  The radiologist stated, "These findings in the proper clinical setting may suggest demyelinating disease such as MS. There is, however, no evidence of active demyelinating plaque. Differential etiologies also include chronic ischemic changes with no evidence of acute infarct."[72]

On February 9, 2005, an MRI of Plaintiff's spine showed broad-

---

[65]    DMSJ, Ex. A-3, Claim File, p. 407.  Ketek is an antibiotic typically used to treat bacterial infections in the lungs and sinuses.  See http://www.drugs.com/ketek.html.

[66]    Id.

[67]    Id.  Cheratussin syrup is a cough medication containing codeine and guaifenesin.  See http://www.cheratussin.com.

[68]    Id.  D-amphetamine is a central nervous system stimulant.  See http://www.online-medical-dictionary.org/d+Amphetamine.asp?q=d+Amphetamine.

[69]    DMSJ, Ex. A-3, Claim File, p. 408.  Depakote can be prescribed for seizures, bipolar disorder and/or migraine headaches.  See http://www.pdrhealth.com/drug_info/rxdrugprofiles/drugs/dep1125.shtml.

[70]    Id.  Adderall is a central nervous system stimulant.  See http://www.pdrhealth.com/drug_info/rxdrugprofiles/drugs/dep1125.shtml.

[71]    Id.  Diovan is a blood-pressure medication.  See http://www.diovan.com/index.jsp?usertrack.filter_applied=true&NovaId=3350119499458053297.

[72]    DMSJ, Ex. A-3, Claim File, p. 207.

based diffuse disc bulge with loss of disc height and disc dessication and degeneration at the L4-L5 level with bilateral facet hypertrophy and ligamentum flavum hypertrophy and moderate neural foraminal narrowing without evidence of impingement on the exiting nerve root."[73]  The radiologist found no evidence of an abnormal cord signal and noted a mild neural foraminal narrowing at the L3-L4 level without evidence of disc herniation.[74]

On February 12, 2005, Dr. McLauchlin prescribed Methocarbamol, a muscle relaxant.[75]  On February 17, 2005, Plaintiff was referred to J. Gavin Norris, M.D., ("Dr. Norris"), a neurologist, by Dr. Salvato.  Dr. Norris took a medical history and conducted a physical examination of Plaintiff.  He recommended, in light of the February 2005 abnormal brain MRI and her history of smoking and fatigue, that she obtain cardiac and pulmonary evaluations in addition to a rheumatological examination.[76]

On February 19, 2005, Plaintiff reported by telephone to Dr. McLauchlin that the new medication was not relieving the pain and made her feel "wired."[77]  The doctor's response was not legible.[78]

---

[73]    DMSJ, Ex. A-3, Claim File, p. 208.

[74]    Id.

[75]    DMSJ,    Ex.   A-3,   Claim   File,   p.   322.     See http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682579.html.

[76]    DMSJ, Ex. A-3, Claim File, p. 367.

[77]    DMSJ, Ex. A-3, Claim File, p. 299.

[78]    Id.

On February 22, 2005, Plaintiff saw J. Navarijo, ("Dr. Navarijo"), a cardiologist, complaining of chest pains and spasms.[79] An electrocardiogram ("EKG") revealed normal heart functions.[80] However, a stress test showed a possible stress-induced septal ischemia.[81]

On February 24, 2005, Plaintiff saw Samuel Pegram, M.D., ("Dr. Pegram"), a rheumatologist.[82]  In the medical history portion of his records, Dr. Pegram recorded that Plaintiff had had diffuse muscle and joint pain for approximately ten years, along with bilateral arm weakness.  Plaintiff reported that these episodes would resolve without treatment.  Plaintiff stated that, in November 2004, she began having intermittent headaches.[83]  Dr. Pegram's history also stated that Plaintiff claimed that she had been evaluated by a neurologist who suspected that Plaintiff had multiple sclerosis although the MRI scan was not diagnostic.[84]  Dr. Pegram noted that a cardiologist had recently diagnosed Plaintiff as having coronary

---

[79]    DMSJ, Ex. A-3, Claim File, p. 321.

[80]    DMSJ, Ex. A-3, Claim File, p. 322.

[81]    DMSJ, Ex. A-3, Claim File, p. 325.  "Ischemia" is the decreased blood supply to an organ or tissue, often marked by pain and organ dysfunction. MOSBY'S POCKET DICTIONARY OF MEDICINE, NURSING & ALLIED HEATH ("MOSBY'S") 485 (1st ed. 1990).

[82]    DMSJ, Ex. A-3, Claim File, p. 256.

[83]    Id.

[84]    Id.

artery disease.[85] Plaintiff reported that, although she slept four to five hours per night, she got enough sleep and woke up feeling rested.[86]

On February 25, 2005, Plaintiff returned to Dr. Norris complaining that her migraine headaches "may be returning."[87] Dr. Norris again recommended that Plaintiff proceed with pulmonary and cardiac evaluations.[88] He also suggested that she substitute Advil for Alleve for pain relief.[89]

On March 15, 2005, Plaintiff was seen by P. Julie Nguyen, M.D., ("Dr. Nguyen") for evaluation of Plaintiff's cough and shortness of breath as recommended by Dr. Norris.[90] Dr. Nguyen found that Plaintiff had clear lung fields with some mild to moderate obstruction that improved after a bronchodilator was employed. The amount of air she could expel from her lungs was considered normal.[91] Plaintiff was prescribed medication for wheezing symptoms and advised to quit smoking.

On March 17, 2005, Plaintiff returned to Dr. Salvato

---

[85]   Id.

[86]   DMSJ, Ex. A-3, Claim File, p. 261.

[87]   DMSJ, Ex. A-3, Claim File, p. 369.

[88]   Id.

[89]   Id.

[90]   DMSJ, Ex. A-3, Claim File, p. 269.

[91]   DMSJ, Ex. A-3, Claim File, p. 270. "FVC [forced vital capacity] was normal at 81%."

16

complaining of persistent headaches, swelling in her hands, arms and legs, asthma, cold sores, rash and shoulder pain. At that time, Plaintiff reported taking Paxil, Adderall, Advair, an asthma medication, and Diovan.[92] Dr. Salvato again noted that Plaintiff was "positive" for depression.[93]

On March 17, 2005, Plaintiff saw Dr. Norris and reported that Dr. Nguyen found her lungs to be in good shape but diagnosed bronchial asthma and prescribed medication for that condition.[94] A physical examination showed no remarkable changes in Plaintiff's condition.[95]  Dr. Norris referred Plaintiff for a thoracic spine MRI.  That MRI, taken on March 30, 2005, was unremarkable.[96]

On March 30, 2005, Plaintiff was seen by Norma Cooke, Ph.D, ("Dr. Cooke") of Baylor College of Medicine, Department of Neurology, for a neuropsychological evaluation of her cognitive and emotional functioning as recommended by Dr. Salvato.[97]

Plaintiff reported symptoms of fatigue and migraine headaches beginning in the fall of 2004.[98]  She stated that she had more

---

[92]    DMSJ, Ex. A-3, Claim File, p. 223.

[93]    DMSJ, Ex. A-3, Claim File, p. 220.

[94]    DMSJ, Ex. A-3, Claim File, p. 368.

[95]    Id.

[96]    DMSJ, Ex. A-3, Claim File, p. 370.

[97]    DMSJ, Ex. A-3, Claim File, p. 577.

[98]    Id.

energy in the early mornings but by mid-morning her energy began to lag.  She claimed she was in bed by 8:00 p.m., but often woke up after midnight and found it difficult to remain asleep.[99]  Plaintiff discontinued her daily four-mile walks and, as a result, reported gaining thirty pounds after October 2004.[100]

Plaintiff also reported that she was depressed, had decreased patience with family members and had a shorter temper.[101]  She disclosed having thoughts of suicide at the end of 2004, after abruptly discontinuing her use of Paxil.[102]  Plaintiff complained of recent memory loss, general confusion, decreased concentration and word-finding difficulties.[103]

Dr. Cooke administered the Wechsler Adult Intelligence Scale - Third Edition ("WAIS-III"), the Minnesota Multiphasic Personality Inventory - Second Edition ("MMPI-2"), the Mini-Mental State examination, the Wechsler Memory Scale - Third Edition ("WMS-III") and other cognitive and motor tests.[104]

In light of all the tests, Dr. Cooke concluded that Plaintiff

---

[99]    Id.

[100]   Id.

[101]   Id.

[102]   Id.

[103]   Id.

[104]   DMSJ, Ex. A-3, Claim File, p. 578.

was performing in the average range of intellectual functioning.[105] Plaintiff showed impairments in selective areas of executive functioning when dealing with complex material.[106] Her executive functioning, including rote attention, processing speed, basic mental tracking and all other cognitive domains were intact.[107]

Dr. Cooke noted that the results of the memory testing were not inconsistent with very mild frontal-subcortical dysfunction, but, regardless of the etiology, the "mild, isolated impairments [did] not account for Mrs. Hicks' reported functional decline. In particular, there was no evidence of memory loss; in fact, memory skills were generally in the average range."[108]

Dr. Cooke recommended that, in light of evidence of significant emotional distress, Plaintiff might benefit from individual psychotherapy to cope with the distress and to "help her understand the relationship between physical symptoms and affective stress."[109]

On April 6, 2005, Plaintiff was evaluated by Suzanne Page, M.D., ("Dr. Page"), a board-certified rehabilitation physician, for

---

[105]   DMSJ, Ex. A-3, Claim File, p. 580.

[106]   Id.

[107]   Id.

[108]   Id.

[109]   Id.

19

fatigue and low back pain.[110]   A physical examination noted some significant tender points in the sternocleidomastoid muscles and supraspinatus, bilaterally, but no other trigger points were noted in the cervical spine, rhomboid muscles, or the infraspinatus, serratus anterior, thoracic paraspinals or latissimus dorsi ligaments.[111] Plaintiff reported that although her pain was bad, she usually did not take pain medication.[112]

A detailed functional capacity test showed that Plaintiff was able to lift thirty pounds from waist to shoulder, forty pounds from floor to waist and thirty pounds from floor to shoulder on an occasional basis.[113]   She was able to lift twenty pounds from waist to shoulder, zero pounds from floor to waist and ten pounds from floor to shoulder on a frequent basis.[114]   Plaintiff was able to carry thirty pounds over a distance of thirty feet,[115] push forty-five pounds and pull forty-three pounds.[116]   The examiner found that Plaintiff appeared to demonstrate maximal effort on all tests

---

[110]   DMSJ, Ex. A-3, Claim File, pp. 582-86.

[111]   DMSJ, Ex. A-3, Claim File, p. 584.

[112]   DMSJ, Ex. A-3, Claim File, p. 585.

[113]   DMSJ, Ex. A-3, Claim File, p. 587.

[114]   Id.

[115]   Plaintiff stopped this test at thirty pounds.  At that time, her heart rate had risen from 104 beats per minute to 118 beats per minute.  The examiner would have stopped the test if her heart rate rose above 150 beats per minute, calculated as eighty-five percent of the age-predictive maximum heart rate.  See DMSJ, Ex. A-3, Claim File, p. 598.

[116]   DMSJ, Ex. A-3, Claim File, p. 587.

except the rapid exchange grip.[117]  Plaintiff was found to be "below competitive" on the Frequent Crouching/Squatting Reach, the Frequent Kneeling Reach, Frequent Standing Position Reach, the Frequent Stooping Reach and the Frequent Upper Level Reach as she was unable to complete the timed repetitive tests within the allotted time.

At the conclusion of all testing, the examiner concluded that Plaintiff was qualified for a light occasional physical demand level with a safe lifting limit of thirty pounds and a light frequent physical demand level of ten pounds.[118]  However, Dr. Page also cautioned that, in spite of these abilities, the degree of fatigue demonstrated by Plaintiff would prevent her from being able to work for several days after such exertions.[119]

On July 12, 2005, Dr. Norris wrote a letter to Defendant in support of Plaintiff's claim for disability benefits.[120]  He reported that Plaintiff had received a ventriculoperitoneal ("VP") shunt on June 28, 2005, to treat a pseudotumor cerebri[121] and opined

---

[117]   DMSJ, Ex. A-3, Claim File, p. 594.

[118]   Id.

[119]   DMSJ, Ex. A-3, Claim File, p. 623.

[120]   DMSJ, Ex. A-3, Claim File, p. 511.

[121]   Pseudotumor cerebri is a syndrome disorder defined clinically by four criteria: (1) elevated intracranial pressure as demonstrated by lumbar puncture; (2) normal cerebral anatomy, as demonstrated by neuroradiographic evaluation; (3) normal cerebrospinal fluid composition; and (4) signs and symptoms of increased intracranial pressure, including papilledema.  See Handbook of Ocular Disease Management, Jobson Publishing Co., 2000; http://www.revoptom/HANDBOOK/hbhome/htm.

that she "probably" had the pseudotumor cerebri in October 2004. In spite of the fact that he had first seen Hicks on February 17, 2005, Dr. Norris opined, "The headache for this is quite disabling, with which Ms. Hicks would not have been able to work at all.  It was briefly improved at her first visit with me but worsened again soon after."[122]

### C. Surveillance of Plaintiff (April 28, 2005, to May 1, 2005)

Also contained in the materials reviewed by Defendant is a report of surveillance on Plaintiff from April 28, 2005, to May 1, 2005.[123]  Briefly summarized, Plaintiff was observed to be in her residence on April 28, 2005, from 6:18 a.m. to 10:12 a.m., when surveillance was discontinued.[124]   On that same date, she was observed to be in her residence from 4:03 p.m. to 6:47 p.m., when she drove to a restaurant.[125]   It was reported that she walked several hundred feet to the entrance of the restaurant, ate dinner for two hours, returned to her car on foot and drove home.[126]

On April 29, and 30, 2005, Plaintiff remained inside her residence.[127]  On Sunday, May 1, 2005, Plaintiff and her husband

---

[122]   Id.

[123]   DMSJ, Ex. A-3, Claim File, pp. 484-87.

[124]   DMSJ, Ex. A-3, Claim File, p. 484.

[125]   DMSJ, Ex. A-3, Claim File, pp. 485.

[126]   Id.

[127]   Id.

22

were observed returning to their residence at 9:29 a.m.[128]  She was

not observed to have any restrictive behavior in her movements.[129]

### D.  __Claim History__

Plaintiff filed her claim for long-term disability benefits on

February 26, 2005.[130]   On March 10, 2005, Defendant informed

Plaintiff that it needed additional medical information concerning

her claim and had requested that information from her treating

physicians.[131]

In a letter dated June 8, 2005, Defendant notified Plaintiff

that, based on the lack of objective information in her medical

record supporting a claim of total disability dating from the onset

of disability through the elimination period, it was unable to

approve her claim for long-term disability benefits.[132]  Defendant

explained that, under the Policy, there must be evidence of an

inability to perform her job, in her case, a sedentary, data-entry

position that required significant sitting, from November 9, 2004,

through February 7, 2005.[133]

The  letter  analyzed  the  medical  records  submitted  by

---

[128]    DMSJ, Ex. A-3, Claim File, p. 485-86.

[129]    __Id.__

[130]    DMSJ, Ex. A-3, Claim File, pp. 116-19.

[131]    DMSJ, Ex. A-3, Claim File, pp. 179-81.

[132]    DMSJ, Ex. A-3, Claim File, pp. 495-96.

[133]    __Id.__

Plaintiff, noting that, in spite of Plaintiff's subjective complaints of headaches and weakness, the November and December 2004 labwork was normal except for slightly elevated Epstein Barr virus titers.[134]   Other than Dr. Salvato's notations of chronic fatigue, memory loss, muscle and joint pain and depression and Dr. McLaughlin's treatment of Plaintiff's headaches, the medical records did not support a conclusion that Plaintiff was totally disabled during the elimination period.  Defendant also noted that later evaluations by treating pulmonary, neurology, cardiology, and rheumatology specialists failed to find anything remarkable in Plaintiff's physical condition to support her claim of total disability during the elimination period.[135]  Plaintiff was informed of the appeal process.[136]

On June 23, 2005, Plaintiff notified Defendant that she had been diagnosed with "a rare neurological condition" that would require brain surgery, presently planned for June 28, 2005.   On July 1, 2005, Defendant acknowledged Plaintiff's appeal and requested that all additional information be submitted by August 13, 2005.[137]

In a letter dated August 23, 2005, Defendant informed

---

[134]   Id.

[135]   Id.

[136]   Id.

[137]   DMSJ, Ex. A-3, Claim File, p. 505.

Plaintiff that it referred her file for additional review and comment by a medical doctor and a psychological care provider. It estimated that a final decision on her file would be made within forty-five days.[138]

On August 29, 2005, Plaintiff's file was reviewed by V. Himber, M.D., ("Dr. Himber"), a psychiatrist, at Defendant's request to assess whether the record provided "credible, objective and contemporaneous" evidence of an incapacitating psychiatric disorder during the elimination period and to the present.

Dr. Himber noted that, of the many physicians seen by Plaintiff during the elimination period, only Dr. Salvato noted that Plaintiff complained of depression. However, as Dr. Salvato performed no testing to support a diagnosis of depression, her conclusion was not supported by objective evidence in Dr. Himber's opinion.

On September 1, 2005, William J. Hall, M.D., ("Dr. Hall"), an internist, reviewed Plaintiff's records at Defendant's request.[139] Dr. Hall was not able to identify primary source medical records to support an objective, medically limiting condition during the elimination period.[140]  He noted that, although not assigned a clinical diagnosis of Chronic Fatigue Syndrome ("CFS") by Dr.

---

[138]   DMSJ, Ex. A-3, Claim File, p. 569.

[139]   DMSJ, Ex. A-3, Claim File, pp. 556-61, 668.

[140]   DMSJ, Ex. A-3, Claim File, p. 560.

Salvato, Plaintiff's subjective and self-reported symptoms fulfilled a diagnostic criteria for CFS. However, in Dr. Hall's opinion, CFS was not considered to be medically limiting based solely on a diagnosis, rather, that determination was to be based on the severity of the symptoms.[141] Dr. Hall indicated that absent information to the contrary, significant weight must be given to the treating physician's assessment of the severity of Plaintiff's symptoms.[142] Dr. Hall also stated that, in his opinion, there was insufficient information in the medical record to justify Dr. Page's conclusion that Plaintiff was unable to work.[143]

Dr. Hall reported that the medical records contained no objective clinical information with which to support Dr. Norris's diagnosis and treatment of pseudotumor cerebri in June 2005.[144]

On September 23, 2005, Defendant denied Plaintiff's claim for long-term disability benefits.[145] Citing the policy's definition of "total disability," Defendant stated that the file did not show that Plaintiff was so severely impaired by chronic headaches and/or chronic fatigue syndrome that she could not have continued working beyond November 8, 2004.

---

[141]   Id.

[142]   Id.

[143]   Id.

[144]   Id.

[145]   DMSJ, Ex. A-3, Claim File, pp. 672-79.

26

Defendant acknowledged that on February 3, 2005, Dr. Salvato rated Plaintiff at a Class 5 disability level, evidencing the most severe limitation of functional capacity, and opined that Plaintiff was incapable of performing minimum, sedentary activity or any work.   However, Defendant explained that it discounted Dr. Salvato's opinion because it appeared to be based solely on Plaintiff's subjective, self-reported limitations that were not supported by other information in the medical records.   Defendant noted that Dr. Salvato failed to conduct a detailed assessment of Plaintiff's functional capacity or specify any limitations or restrictions on Plaintiff's functionality.   Dr. Salvato reported that Plaintiff was incapable of working before she referred Plaintiff for functional capacity testing and neuropsychological evaluation.   In addition, Dr. Salvato's Attending Physician Statement did not list any restrictions or limitations and failed to include any information in support of her opinion that Plaintiff was totally disabled.[146]

Defendant also discussed Plaintiff's past history of headaches and elevated Epstein Barr virus titers dating to early 2004 that had not affected her ability to work and the lack of objective evidence in Plaintiff's medical file supporting her claim that her symptoms had become worse, culminating in her inability to work

---

[146]    DMSJ, Ex. A-3, Claim File, p. 673.

past November 8, 2004.[147] Defendant noted that Plaintiff's lab work
in November and December 2004 was substantially within normal
limits, Plaintiff's headaches, as diagnosed by Dr. McLauchlin, were
caused by tension and Dr. Norris's neurological evaluation in
February 2005 reported essentially normal results.

With respect to the Functional Capacity Evaluation dated April
6, 2005, and the neuropsychological assessment conducted on March
30, 2005, Defendant noted that neither study supported Plaintiff's
claim that she was disabled from November 9, 2004, through February
7, 2005, as required under the Policy.[148] Defendant stated that
Plaintiff demonstrated the ability to occasionally lift thirty
pounds and frequently lift ten pounds, qualifying Plaintiff to
perform work at the light exertional level, in spite of her self-
characterization as "crippled" to the physical therapist who
conducted the exam.[149] Plaintiff's hand grip strength was not found
to be so severe as to significantly impair her ability to function,
according to Defendant.  The Defendant also discounted Dr. Page's
opinion that Plaintiff was unable to work, relying on Dr. Hall's
opinion that it was not supported by the medical record and was
based solely on Plaintiff's self-report.  The neuropsychological
evaluation did not substantiate that Plaintiff was suffering from

---

[147]   Id.

[148]   DMSJ, Ex. A-3, Claim File, p. 674.

[149]   Id.

a significant functional impairment that rendered her totally disabled.[150]

Defendant explained that Plaintiff's current medical diagnosis of pseudotumor cerebri by Dr. Norris and his opinion that Plaintiff was disabled due to headaches commencing October 12, 2004, was not supported by the record because Dr. Norris had not begun treating Plaintiff until February 17, 2005, after the elimination period. His opinion was also contradicted by Plaintiff's work history which indicated that she had worked full-time through November 8, 2004, nearly a month after Dr. Norris asserted that her total disability began.[151]

Defendant also cited Dr. Himber's opinion that the medical records did not evidence an incapacitating psychiatric disorder during the elimination period and beyond.[152]

On November 29, 2005, Defendant rejected Plaintiff's request for reconsideration of its earlier denial and again explained its reasoning based on information contained in her medical records and the reviews by its medical experts.[153]

Based on information from Plaintiff's employer that Plaintiff's position was sedentary as it involved sitting seven

---

[150]    Id.

[151]    DMSJ, Ex. A-3, Claim File, p. 676.

[152]    Id.

[153]    DMSJ Ex. A-3, Claim File, pp. 14-16.

hours per day and allowed a change of positions at will, Defendant concluded that Plaintiff was not so severely impaired throughout the elimination period that she could not have performed her work duties as an operations manager and denied her claim.[154]

Plaintiff filed this action on May 19, 2006, claiming wrongful denial of ERISA benefits, breach of fiduciary duty and attorney's fees and costs.

## II.  Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Brown v. City of Houston, Tex., 337 F.3d 539, 540-41 (5th Cir. 2003).

The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues.  Celotex Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir. 1992).  If the moving party can show an absence of record evidence in support of one or more elements of the case for which

---

[154]    DMSJ, Ex. A-3, Claim File, p. 677.  The denial letter also discussed an alternative grounds for denial of the claim based on pre-existing conditions of headaches, depression, anxiety, and fatigue.  As the court finds, infra, that Defendant's decision was not arbitrary on its primary ground for denial, the alternative grounds are not discussed.

the nonmoving party bears the burden, the movant will be entitled
to summary judgment.  <u>Celotex Corp.</u>, 477 U.S. at 322.

### III. Analysis

#### A.  <u>Plaintiff's ERISA Claim</u>

The Employee Retirement Income Security Act ("ERISA")
furnishes district courts with jurisdiction to review
determinations made by employee benefits plans, including
disability insurance plans.  <u>See</u> 29 U.S.C. § 1132(a)(1)(B); <u>Baker
v. Metro. Life Ins. Co.</u>, 364 F.3d 624, 629 (5th Cir. 2004).  When
the plan fiduciary is vested with the discretionary authority to
determine disability claims under the plan, a district court may
reverse the decision regarding a denial of benefits only for an
abuse of discretion that yields an arbitrary and capricious
decision.  <u>See</u> <u>Robinson v. Aetna Life Ins. Co.</u>, 443 F.3d 389, 395
(5th Cir. 2006).  "A decision is arbitrary only if made without a
rational connection between the known facts and the decision or
between the found facts and the evidence;" the fiduciary's decision
must be affirmed if it is supported by substantial evidence.
<u>Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.</u>, 168 F.3d 211,
215 (5th Cir. 1999)(internal quotation marks omitted).  "Substantial
evidence is more than a scintilla, less than a preponderance, and
is such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion."  <u>Ellis v. Liberty Life Assurance
Co. of Boston</u>, 394 F.3d 262, 273 (5th Cir. 2004).

In instances where the benefit plan gives discretion to a fiduciary who is operating under a conflict of interest "that conflict must be weighed as a factor in determining whether there is an abuse of discretion." Estate of Bratton v. National Union Fire Ins. Co., 215 F.3d 516, 521 (5th Cir. 2000). The Fifth Circuit applies a "sliding scale standard" in those cases where, as here, the administrator is self-interested because it is also the insurer. Vega v. Nat'l Life Ins. Serv., Inc., 188 F.3d 287, 295-97 (5th Cir. 1999)(en banc). However, a plaintiff must point to more evidence of a conflict than merely a dual role to justify any significant reduction in deference given to the administrator's decision. See Ellis, 394 F.3d at 270 n.18. Because Plaintiff has failed to present any evidence suggesting that a conflict existed that affected Defendant's decision-making in this case, the court reviews the decision with only "a modicum less deference" than it would otherwise employ. See Vega, 188 F.3d at 301.

This brings the court to the crux of the dispute between the parties. Defendant contends that it is entitled to summary judgment because it did not abuse its discretion in denying Plaintiff's claim for long-term disability benefits. In Plaintiff's cross-motion for summary judgment, she argues that Defendant's decision was arbitrary and capricious because (1) Defendant's own reviewer, Dr. Hall, agreed that Plaintiff had CFS and that her symptoms appeared credible to her treating physicians;

(2) Dr. Norris believed that Plaintiff's pseudotumor cerebri was present in October 2004; (3) Defendant's initial reviewer, Deborah Dirck, a registered nurse, was unqualified to review medical information and Dr. Hall, an internist, had no expertise in neurology; (4) the results of the Functional Capacity Exam should not have been considered; and (5) any suggestion that Plaintiff was malingering because of results of video surveillance was irrational.

As an initial point, the court can dispense with Plaintiff's last contention first.  As the court does not rely on Defendant's video surveillance of Plaintiff in its consideration whether Defendant abused its discretion in denying long-term disability benefits to Plaintiff, the significance of the video surveillance is simply a non-issue.

In order to qualify for benefits, Plaintiff had to establish that she was unable to perform her job functions starting on November 9, 2004, through February 7, 2005, the elimination period, and remained totally disabled beyond that time period.  Describing Plaintiff's functional activities, Plaintiff's employer stated that, in a typical workday, Plaintiff spent approximately seven hours sitting, a half-hour standing, a half-hour walking and could alternate these positions at will.[155]  Plaintiff's employer also related that Plaintiff occasionally had to bend, climb, reach above

---

[155]     DMSJ, Ex. A-3, Claim File, p. 113.

shoulder level, push or pull and lift or carry twenty pounds.[156]

In her February 2005 application for benefits, Plaintiff claimed to be totally disabled from fatigue, blurry/double vision, migraine headaches, memory confusion and speech difficulties and that these symptoms had their onset in November 2004.[157]   She further stated that she was first treated for this condition by Dr. Berkman, an internist, on November 14, 2004.[158]

Defendant, in its September 23, 2005, letter, found that the medical record failed to disclose the basis for Plaintiff's claim that she became totally disabled from work on November 9, 2004, when her employment record established that she had worked, full-time, through November 8, 2004.   Immediately before her claimed onset of disability, Plaintiff had seen a doctor on November 2, 2004, and complained of a sore throat.   The medical record does not show any doctor visits prior to November 8, 2004, that could account for either an acute disabling condition or a worsening chronic condition resulting in a total inability to work on November 9, 2004.

Plaintiff's claim for long-term disability benefits was supported by two attending physician statements.   On February 7, 2005, Dr. Salvato reported to Defendant that Plaintiff was

---

[156]   <u>Id.</u>

[157]   DMSJ, Ex. A-3, Claim File, p. 116.

[158]   <u>Id.</u>

34

suffering from a Class 5 severe limitation of functional capacity and could not perform even minimum, sedentary activity.[159]   She reported that the onset of Plaintiff's symptoms began in December 2004 and Plaintiff's disability commenced February 3, 2005.[160]   Dr. Salvato failed to support this opinion with any information concerning Plaintiff's restrictions and limitations of activity, leaving the entire section of the form blank.

Based on the lack of information on the form and in the Plaintiff's medical records, Defendant concluded that Dr. Salvato had not administered any objective tests of strength, stamina, memory or concentration but had simply checked the box consistent with Plaintiff's self-reported limitations.   Defendant discounted this opinion as not supporting Plaintiff's claim because the onset of disability covered only the last four days of the elimination period and failed to adequately assess Plaintiff's functional limitations.   The records did show that Dr. Salvato referred Plaintiff for a functional capacity assessment, neuropsychological evaluation and an MRI that were conducted well after Dr. Salvato's assertion that Plaintiff was totally disabled from work.   As those evaluations also did not support Plaintiff's claim that she was totally disabled during the elimination period and beyond, Dr.

---

[159]   DMSJ, Ex. A-3, Claim File, p. 106.

[160]   Id.   The court notes that the onset date of symptoms was later interlined to reflect November 2004, but was not initialed to indicate authorship or the date it occurred.   See DMSJ, Ex. A-3, Claim File, p. 126.   As such, it cannot be given any weight.

Salvato's February 2005 opinion was unsupported by objective clinical observation.

The second attending physician statement opining that Plaintiff was totally disabled was signed by Dr. Berkman on March 8, 2005.[161] He did not report any functional capacity information on the form other than to refer Defendant to the earlier opinion of Dr. Salvato.[162] Dr. Berkman only saw Plaintiff once during the elimination period, in December 2004, when she complained of headaches and weakness. His medical records from this time period do not contain any indication that Plaintiff was totally disabled from work or that he recommended that she not work because of her health.

In this context, it is important to note that Defendant does not contest that Plaintiff may be suffering from CFS, and in fact, Defendant's reviewer, Dr. Hall, assumed a diagnosis of CFS. But as Dr. Hall pointed out in his review, it is not the diagnosis of CFS that it determinative, rather, it is the severity of the symptoms that must inform the decision.[163] See Karvelis v. Reliance Standard Ins. Co., 2005 WL 1801943, at *15 (S.D. Tex. July 28, 2005)(holding that a denial of a claim based on "the lack of substantial objective medical evidence of symptoms or their [e]ffect on [the

---

[161]   DMSJ, Ex. A-3, Claim File, pp. 154-57.

[162]   DMSJ, Ex. A-3, Claim File, p. 156.

[163]   DMSJ, Ex. A-3, Claim File, p. 560.

plaintiff's] ability to work . . . would be consistent with opinions upholding insurers' denial for long-term disability benefits").

Dr. Hall stated that "absent information to the contrary, significant weight" must be given to Dr. Salvato's opinion that Plaintiff's symptoms were medically limiting.[164]   However, as discussed by Defendant in its denial letter, there was ample evidence to contradict Dr. Salvato's opinion.   Aside from the absence of any medical evidence from the elimination period that warrants a finding of disability, several post-elimination period examinations indicate Plaintiff's ability to work.   For example, the Functional Capacity Exam found that Plaintiff was capable of performing her sedentary job duties, and the neuropsychological examination found Plaintiff's intellectual and executive functioning capacities to be intact.   Both examinations provided additional support to Defendant's finding that Plaintiff was not totally disabled during the elimination period.

Defendant was not obligated to give any special deference to the opinions of Plaintiff's treating physicians.   See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003).   In light of lack of information provided by Dr. Salvato and her opinion that Plaintiff's disability did not commence until February 3, 2005, the Defendant was well within its discretion to deny benefits on that

---

[164]   Id.

basis alone, because the policy required a finding a total disability beginning November 9, 2004, not just the last four days of the elimination period.

Plaintiff's other challenges to Defendant's claim decision are equally unavailing. Despite Dr. Norris's July 2005 belief that Plaintiff's pseudotumor cerebri was present and disabling in October 2004, his June 2005 diagnosis and shunt placement simply do not justify retroactively finding that Plaintiff was totally disabled in nine months earlier. The only evidence supporting Dr. Norris's opinion is a letter dated July 12, 2005. He attached no medical records supporting either his diagnosis of pseudotumor cerebri or his opinion that Plaintiff was suffering from this condition during the elimination period. Dr. Norris did not begin to treat Plaintiff until after the elimination period. Importantly, earlier MRI's of Plaintiff's brain were considered unremarkable. While a February 9, 2005, MRI showed bilateral cerebral white matter consistent with demyelinating disease or small arterial vessel occlusive disease, it was not considered active. At that time, Dr. Norris, himself, found no need for further testing, but instead referred Plaintiff to a cardiologist and rheumatologist.

Plaintiff also argues that both the initial reviewer, a registered nurse, and Dr. Hall were unqualified to review Plaintiff's particular medical ailments. This argument can be

quickly dismissed.  First, Plaintiff offers no legal authority in support of her challenge to the initial reviewer's qualifications, and the court finds none.  Second, the regulation upon which Plaintiff relies to challenge Dr. Hall's qualifications requires that appeals of adverse decisions be made in consultation "with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment."  29 C.F.R. § 2560.503-1(h)(3)(iii).  Like Drs. Salvato and Berkman, Dr. Hall is an internist.  More significantly, Dr. Norris's letter, containing nothing more than his opinion, provided nothing for a neurologist, or any other doctor, to review.  As Dr. Hall pointed out, "If clinical information [is] obtained, I will be glad to review and comment."[165]

The court also disagrees with Plaintiff regarding the importance of the April 2005 Functional Capacity Exam.  Although not administered during the elimination period, it is informative, particularly in light of the absence of any other objective medical evidence concerning Plaintiff's physical limitations.

In light of the foregoing, it is **RECOMMENDED** that Defendant's motion for summary judgment on Plaintiff's ERISA claim be **GRANTED** and that Plaintiff's cross-motion for summary judgment be **DENIED**.

**B.**  **Plaintiff's Breach of Fiduciary Duty Claim**

As discussed above, the long-term disability policy at issue

_____

[165]   DMSJ, Ex. A-3, Claim File, p. 560.

in this case is subject to the authority of ERISA.  Enforcement of the policy terms is generally provided in 29 U.S.C. § 1132 ("section 1132"), which states in part "[a] civil action may be brought by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B). Section 1132 alternatively provides recourse for "a participant, beneficiary, or fiduciary" who seeks "to obtain other appropriate equitable relief to redress . . . violations [under section 1132] or to enforce any provisions of [section 1132] or the terms of the plan."  29 U.S.C. § 1132(a)(3).

Section 1132(a)(3) acts as a "catchall" provision in the event there is no potential remedy available under section 1132(a)(1). See Varity Corp. v. Howe, 516, U.S. 489, 515 (1996); see also, 29 U.S.C. § 1132(a)(3)  The Supreme Court clarified this point in Varity Corp.  "[W]here Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.'" Id. at 515.

The Fifth Circuit in its application of the Supreme Court's Varity Corp. decision reached the conclusion that "section 1132(a)(3) [allows] plaintiffs to sue for breach of fiduciary duty when no other appropriate equitable relief is available." Tolson v. Avondale Industries, Inc., 141 F.3d 604, 610 (5th Cir. 1999). When there is "adequate relief for the alleged improper denial of

benefits . . . under section 1132(a)(1), relief through the application of [s]ection 1132(a)(3) would be inappropriate." Id.; Accord Rhorer v. Raytheon Eng'rs & Constrs., Inc., 181 F.3d 634, 639 (5th Cir. 1999)(stating "[A]n ERISA plaintiff may bring a private action for breach of fiduciary duty only when no other remedy is available under 29 U.S.C. § 1132").

Here, Plaintiff had an adequate remedy under ERISA for the denial of benefits.  Her alternative claim for breach of fiduciary duty must be dismissed.

It is **RECOMMENDED** that Defendant's motion for summary judgment on Plaintiff's breach of fiduciary duty claim be **GRANTED**.

### C.  Plaintiff's Claim for Attorney's Fees and Costs

Finally, Defendant moves for summary judgment on Plaintiff's request for attorney's fees and costs pursuant to 29 U.S.C. § 1132(g).  Plaintiff's does not have to be a prevailing party in order to request fees.  See Gibbs v. Gibbs, 210 F.3d 491, 501 (5th Cir. 2000).  In Wade v. Hewlett-Packard Dev. Co. LP Short Term Disability Plan, ___ F.3d ___, 2007 WL 2068102 at *7 (5th Cir. July 20, 2007), the Fifth Circuit clarified that courts must apply the Bowen five-factor test in judging both an award of attorney's fees and costs.

In Bowen, the Fifth Circuit enumerated the following factors to be considered in ERISA cases: (1) the degree of the opposing party's culpability or bad faith; (2) the ability of the opposing

party to satisfy an award of attorney's fees; (3) whether an award of attorney's fees against the opposing party would deter other persons acting under similar circumstances; (4) whether the party requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions. Iron Workers Local No. 272 v. Bowen, 624 F.2d 1255, 1266 (5th Cir. 1980).

Defendant argues that there is no evidence that it acted in bad faith, and, because there is no evidence of bad faith or culpable behavior, an award of attorney's fees or costs would not deter its conduct in similar circumstances. Defendant also argues that Plaintiff did not bring this suit on behalf of others or to resolve a significant legal issue. Finally, Defendant contends that the relative merits of the suit are in its favor. Plaintiff has not responded to these arguments in any way.

The court agrees that Plaintiff has put forward no evidence of bad faith on the part of Defendant, and cannot satisfy the first Bowen factor. Turning to the second factor, the court speculates that Defendant could satisfy a fee award but that factor alone does not justify the shifting of fees and costs to a non-prevailing party. Under the third prong of Bowen, Plaintiff has identified no behavior that would be deterred by others acting in similar circumstances. As Plaintiff filed this suit on her own behalf, the

fourth <u>Bowen</u> factor does not militate in her favor.  Finally, the relative merits of this suit belong to Defendant.

In light of the foregoing, it is **RECOMMENDED** that Defendant's motion for summary judgment on Plaintiff's request for attorney's fees and costs be **GRANTED.**

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have ten days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, either electronically or by mail to P.O. Box 61010, Houston, Texas, 77208.  Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 4th day of September 2007.

Nancy K. Johnson
United States Magistrate Judge